UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

**Plaintiff,**

v.

EDUARDO MASFERRER,
JUAN CARLOS BERNACE, and
JOHN M.R. JACOBS,

**Defendants.**

_____/

**03-22524**

**CIV-JORDAN**

MAGISTRATE JUDGE
BROWN

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges that:

### SUMMARY

1.     This case involves corporate malfeasance at the highest levels of a Miami-based former national bank, Hamilton Bank, N.A. ("Hamilton Bank"). From approximately September 1998 through mid-1999, Hamilton Bancorp, Inc. ("Hamilton Corp."), the publicly traded holding company for Hamilton Bank consistently reported record financial results in its SEC filings and press releases for nearly every quarter. These financial results were the product of manipulative accounting practices and tricks designed by top Hamilton Bank and Hamilton Corp. officials to hide tremendous losses associated with certain severely impaired foreign investments. Eventually, the fraudulent scheme unraveled, Hamilton Corp. restated its financial results and its stock price crashed.

## DEFENDANTS

2.        Defendant Eduardo Masferrer ("Masferrer"), age 54, was the chairman of the board of directors, president and chief executive officer of Hamilton Corp.  He also served as chairman, chief executive officer and a director of Hamilton Bank.

3.        Defendant Juan Carlos Bernace ("Bernace"), age 42, was executive vice president and a director of Hamilton Corp.  He also served as president, senior lending officer and a director of Hamilton Bank.

4.        Defendant John M.R. Jacobs ("Jacobs"), age 53, was a senior vice president and chief financial officer of Hamilton Corp. and Hamilton Bank from November 1998 to April 2000.  Prior to that, Jacobs was Hamilton Bank's vice president of commodities and banking relations since January 1997.

## NON-PARTIES

5.        Hamilton Corp. is a Florida corporation with principal offices located in Miami, Florida.  Hamilton Corp. was formed in 1988 as the holding company for Hamilton Bank.  At all relevant times alleged herein, Hamilton Corp. was a public company whose stock traded on the NASDAQ.

6.        Hamilton Bank was a national bank with principal offices located in Miami, Florida and a wholly-owned subsidiary of Hamilton Corp.  Hamilton Bank was engaged in providing global trade finance with particular emphasis on trade with and between South America, Central America and the Caribbean.  During the relevant period, Hamilton Bank had about $1.6 billion in assets under management.  On January 11, 2002, the Office of the Controller of the Currency ("OCC"), the federal agency which regulates banks, closed Hamilton

2

Bank because of, among other things, unsafe and unsound practices and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver for Hamilton Bank.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, the means and instrumentalities of transportation and communication in interstate commerce, and the mails, or the facilities of a national securities exchange, in connection with the acts, practices, and courses of conduct complained of herein.

9.     Defendants' acts and practices described herein, which constitute violations of the Securities Act and the Exchange Act, occurred within the Southern District of Florida.

## BACKGROUND

10.     From the time it became a public company in March 1997, Hamilton Corp.'s stock was highly favored by analysts and investors alike.  From March 1997 through mid-1999, Hamilton Corp. reported record earnings for nearly every quarter.  Wallstreet analysts expected Hamilton Corp. to continue to perform favorably and meet or exceed their earnings expectations. Indeed, Wallstreet analysts' consensus estimates of Hamilton Corp.'s earnings for the third quarter of 1998 was a record $.54 per share.

## RUSSIAN LOANS

11.     In 1998, Hamilton Bank owned certain Russian-based investment assets.  These assets consisted of a loan to the City of Moscow and loans to three Russian banks called

3

Gazprombank, Vneshtorgbank and Mezhcombank (collectively "Russian loans").  During the Summer of 1998, the Russian economy was on the verge of collapse.  The dismal condition of the Russian economy caused the value of Russian-based investments to spiral downward or, in accounting terms become impaired, due to an increased risk of uncollectability.  Masferrer, Bernace and Jacobs knew of the worsening economic conditions in Russia and its negative impact on Hamilton Bank's Russian holdings.

12.    In early September 1998, the OCC, due to the rapidly deteriorating Russian economy, directed Hamilton Bank to take a minimum 25% reserve for the Russian loans on its books.  In actuality, the Russian loans were impaired by 80% (ie. their fair value had declined to 20% of their face value).

### Exchange Transaction with West Merchant in September 1998

13.    In mid-September 1998, Jacobs, acting at Masferrer and Bernace's direction, approached West Merchant Bank Ltd., ("West Merchant") about a transaction involving three impaired Russian loans on Hamilton Bank's books --- the City of Moscow, Gazprombank and Vneshtorgbank loans (collectively "CG&V loans").

14.    Jacobs, at Masferrer and Bernace's direction and with their approval, proposed to West Merchant that the banks enter into an exchange transaction known in the banking industry as a "ratio swap" or "adjusted price trading."   (A "ratio swap" or "adjusted price trading" consists of selling assets at inflated prices in exchange for purchasing assets at inflated prices).  Jacobs stated that Hamilton Bank needed to "get out" of the impaired CG&V loans by the "end of month," which was the end of the quarter ended September 30, 1998.

15.     Jacobs, acting at the direction of Masferrer and Bernace, negotiated the details concerning the structure of the transaction with West Merchant, including, the market values of the assets, the prices at which the assets would exchange and the ratios.

16.     Masferrer also directly discussed, with West Merchant, the pricing of the Latin American assets which Hamilton Bank would receive in exchange for the CG&V Russian loans. Masferrer stated to West Merchant that Hamilton Bank wanted to sell its Russian assets because of concerns about recoverability of the loans. Masferrer also said that it was important to Hamilton Bank to dispose of its Russian assets by "month's end," which was the end of the quarter ended September 30, 1998.   Final approval over the transaction rested with Masferrer and Bernace.

17.     The transaction was consummated at the end of the third quarter ended September 30, 1998 when Masferrer, Bernace and Jacobs caused Hamilton Bank to sell the CG&V loans to West Merchant for their face value of $12.5 million, and almost simultaneously, at the inception of the fourth quarter of 1998, purchase Latin American securities and two perpetual notes from West Merchant, through a third party conduit, for their face value of $39,549,000. At that time, the fair value of the CG&V loans was approximately $2.29 million and the Latin American securities and two perpetual notes were valued at approximately $25.7 million.   West Merchant received a trading profit as incentive to engage in the transaction.

18.     As set forth in the table below, the net result of the transaction, after the deduction of West Merchant's trading profit of $3,637,008, was an even swap of impaired assets and cash.



| Hamilton Bank Gave Up | | | Hamilton Bank Received | | |
|---|---|---|---|---|---|
| CG&V Loans (FV) | $ | 2,290,000 | Latin American Securities (FV) | $ | 25,701,992 |
| Cash | | 39,549,000 | Cash | | 12,500,000 |
| *Total* | $ | 41,839,000 | *Total* | $ | 38,201,992 |

Difference: $3,637,008 - Trading Profit Paid by Hamilton Bank
to West Merchant

19.     Hamilton Bank's internal policies prohibited "adjusted price trading."  Hamilton Bank's "Lending and Investment Manual" stated:

> . . . . under no conditions will the bank engage in adjusted trading.  Adjusted trading is a practice involving the sale of a security to a broker or dealer at a price above the prevailing market value and simultaneous purchase and booking of a different security, frequently a lower grade issue or one with a longer maturity, at a price greater than its market value.  Such transactions inappropriately defer the recognition of losses on the security sold and establish an excessive reported value for the newly acquired security.

## Exchange Transaction with Standard Bank London, Ltd.

20.     Hamilton Bank's other Russian-based investment asset in 1998 was the Mezhcombank loan which was not only severely impaired but on the verge of default. Masferrer, Bernace and Jacobs had full knowledge of the impaired status of the Mezhcombank loan and that it was close to default.

21.     In early September 1998, Jacobs, acting at the direction of Masferrer and Bernace and with their approval, approached Standard Bank London, Ltd. ('Standard") about entering into a transaction to dispose of the Mezhcombank loan.  Jacobs proposed the structure of the transaction so that it was an even exchange of impaired assets and cash.  Jacobs stated to Standard that Hamilton Bank wanted par value (face value) assets on its books and did not want to carry discounted assets.  Jacobs also said that the transaction had to take place before the end of the quarter.

22.     Jacobs, Masferrer and Bernace each participated in the negotiations relating to the structure of the transaction.   Each of them engaged in extensive discussions with Standard concerning the values and pricing of the assets the banks were swapping.   Indeed, when Standard did not have sufficient Latin American assets in its inventory to participate in the transaction, Masferrer selected the assets which Standard needed to purchase in the open market.   Final approval over the transaction rested with Masferrer and Bernace.

23.     At the end of the third quarter of 1998, Masferrer, Bernace and Jacobs caused Hamilton Bank to sell the Mezhcombank loan to Standard at its face value of $7.5 million even though its fair value was only approximately $1.5 million.   Immediately thereafter, at the beginning of the fourth quarter of 1998, Hamilton Bank purchased Latin American securities from Standard at their face value of $54.4 million although their fair value was only $46 million. Standard received a trading profit as incentive to engage in the transaction.

24.     As set forth in the following table, the transaction, after deducting Standard's trading profit, was simply an even swap of impaired assets and cash.



| Hamilton Bank Gave Up | | | | Hamilton Bank Received | |
|---|---|---|---|---|---|
| Mezhcombank Loan (FV) | $ | 1,500,000 | Latin American Securities (FV) | $ | 46,033,804 |
| Cash | | 54,410,000 | Cash | | 7,500,000 |
| *Total* | $ | 55,910,000 | *Total* | $ | 53,533,804 |

Difference: $2,376,196 - Trading Profit Paid by Hamilton Bank
to Standard

25.     As set forth in paragraph 19, this transaction violated Hamilton Bank's investment policies set forth in its "Lending and Investment" manual.

7

## MEXICAN TRADE NOTES

### Exchange Transaction with West Merchant Bank, Ltd. in 1999

26.    In September 1999, Jacobs approached West Merchant and stated that Hamilton Bank had impaired assets, consisting of certain Mexican trade notes, it wanted to exchange for unimpaired assets in the same manner as the September 1998 swap transaction between the banks.   Hamilton Bank had taken a partial reserve of $1 million on the Mexican notes due to their impairment.   The Mexican notes had a face value totaling $5 million and a fair value of $1.25 million.

27.    Jacobs again, at Masferrer and Bernace's direction and with their approval, handled the negotiations with West Merchant.   Jacobs proposed the assets that would be exchanged and the ratios.   Jacobs kept Bernace and Masferrer informed as to the specifics of the deal.  Final approval of the transaction rested with Masferrer and Bernace.

28.    During the third quarter ended September 30, 1999, Masferrer, Bernace and Jacobs caused Hamilton Bank to sell the Mexican notes to West Merchant at their face value of $5 million, instead of their fair value of $1.25 million, and purchased foreign debt obligations from West Merchant for their combined face value of $30.25 million instead of their fair value of about $26.3 million.   West Merchant received a trading profit as an incentive to engage in the transaction.

29.     As set forth in the table below, the net effect of the transaction, after the deduction of West Merchant's trading profit, was an even exchange of impaired assets and cash:



| Hamilton Bank Gave Up | | | Hamilton Bank Received | |
| --- | --- | --- | --- | --- |
| Mexican Trade Notes (FV) | $ | 1,250,000 | Foreign Debt Obligations (FV) | $ 26,331,000 |
| Cash | | 30,250,000 | Cash | 5,000,000 |
| *Total* | $ | 31,500,000 | *Total* | $ 31,331,000 |

Difference: $169,000
Trading Profit Paid by Hamilton Bank to West Merchant

30.     As set forth in paragraph 19, this transaction violated Hamilton Bank's investment policies set forth in its "Lending and Investment" manual.

### FALSE AND MISLEADING SEC FILINGS AND PRESS RELEASES

31.     Hamilton Corp., as a publicly traded company, was required to ensure that its financial statements conformed with Generally Accepted Accounting Principles ("GAAP").

32.     Under GAAP (FASB Statement No. 5), an estimated loss from a loss contingency shall be accrued by a charge to income if: (1) information available prior to the issuance of the financial statements indicated that it is probable that an asset has been impaired or a liability had been incurred on the date of the financial statements; and (2) the amount of the loss can be reasonably estimated.

33.     Under GAAP (FASB Statement No. 114) a loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due, including all of the contractual interest payments and all of the contractual principal payments, according to the contractual terms of the loan agreement.

34.     Under GAAP (FASB Statement No. 115 ) securities originally classified as held-to-maturity must be written down to fair value when the holder forms the intent to sell the securities.

9

35.     Under GAAP (FASB Statement No. 115) securities classified as held-to-maturity must be written down to fair value and charged against earnings when impaired unless the impairment is temporary.

36.     Hamilton Corp. did not write down the Russian loans when they became impaired, during the Summer of 1998, and/or when an intent to sell them was formed, at a date unknown but no later than September 1998, as required by GAAP.  Instead, in late September 1998, Hamilton Bank sold the loans at grossly inflated prices in "adjusted price trades" (also known as "ratio swaps") for equally valued impaired assets and cash.   Hamilton Corp. then treated its disposal of the Russian loans as a "stand-alone" face value sale in its books and records instead of as part of an even exchange of impaired assets and cash.  Hamilton Corp. thereby avoided recording losses of approximately $10.2 million in connection with the CG&V loans and $6.0 million with respect to the Mezhcombank loan for a total of $16.2 million in the third quarter of 1998.

37.     Hamilton Corp. also failed to write down the Latin American securities and two perpetual notes, acquired in connection with the CG&V loans and Mezhcombank loan exchange transactions, to fair value to accurately reflect their impaired status as required by GAAP.   As set forth above, Hamilton Corp. treated its sale of the Russian loans and acquisition of the Latin American securities and perpetual notes as independent transactions.  Hamilton Corp. therefore booked the Latin American securities and perpetual notes at the price Hamilton Bank paid, instead of their fair value.   By improperly accounting for the Latin American securities and perpetual notes, Hamilton Corp. hid the trading premiums Hamilton Bank paid to West Merchant and Standard in connection with the "adjusted price trades" (also known as "ratio swaps") and, in

addition to the $16.2 million referenced above, Hamilton Corp. avoided further losses of $1.5 million in the third quarter of 1998 and $4.5 million in the fourth quarter of 1998.

38.     Hamilton Corp. failed to record the Mexican notes at fair value to fully reflect their impaired status and/or write them down to fair value when an intent to sell the notes was formed in late 1999 as required by GAAP. Hamilton Bank sold the Mexican notes at a grossly inflated price as part of an "adjusted price trade" (also known as a "ratio swap") for equally valued impaired assets and cash. Hamilton Corp. then booked Hamilton Bank's disposal of the Mexican notes as a "stand-alone" sale at face value instead of part of an even exchange of impaired assets and cash. Hamilton Corp. thereby avoided a loss of approximately $2.75 million in the third quarter of 1999.

39.     Hamilton Corp. failed to write down the impaired foreign debt obligations it acquired in 1999 from West Merchant, as part of an "adjusted price trade," to fair value in accordance with GAAP. As set forth above, Hamilton Corp. treated Hamilton Bank's acquisition of the foreign debt obligations as distinct from the sale of the Mexican notes and recorded them at face value. By improperly accounting for the foreign debt obligations, Hamilton Corp. hid the trading premium Hamilton Bank paid to West Merchant in connection with the transaction and Hamilton Corp. avoided, in addition to the $2.75 million above, a further loss of $169,000 in the third quarter of 1999.

40.     As a consequence of Hamilton Corp.'s disregard of GAAP, its Forms 10-Q quarterly reports, filed with the SEC, for quarters ended September 30, 1998, March 31, 1999, June 30, 1999 and September 30, 1999, and an annual report on Form 10-K for the year ended December 31, 1998 were materially false and misleading because they grossly overstated, among

others, Hamilton Corp.'s pre-tax income, retained earnings and net income. The following table

details these material misstatements in each filing:

| Period | | RETAINED EARNINGS | | | NET INCOME OR LOSS | | |
|---|---|---|---|---|---|---|---|
| | | Amount Reported ('000's) | Amount Misstated ('000's) | % By Which Misstated | Amount Reported ('000's) | Amount Misstated ('000's) | % By Which Misstated |
| 1998 | Q3 | 58,160 | 11,236 | 19% | 5,685 | 11,293 | 197% |
| | Q4 | 63,815 | 14,304 | 22% | 21,799 | 14,304 | 66% |
| 1999 | Q1 | 69,884 | 14,304 | 20% | 6,069 | -0- | -0- |
| | Q2 | 76,316 | 14,304 | 19% | 6,433 | -0- | -0- |
| | Q3 | 75,580 | 14,304 | 19% | (736) | 1,868 | 254% |

41.     On October 21, 1998, Hamilton Corp. issued a press release announcing its 1998

third quarter financial results. In this press release, Hamilton Corp. claimed that it had achieved

record net income of $5.7 million for the third quarter (three months ended September 30, 1998).

These numbers, among others, were grossly overstated because of Hamilton Corp.'s failure to

properly account for the Russian loans it sold during that quarter and its related purchase of the

Latin American securities and perpetual notes during the end of that quarter and the beginning of

the fourth quarter. In reality, Hamilton Corp. incurred a net loss of $5.6 million for the third

quarter of 1998 (three months ended September 30, 1998).

42.     On January 20, 1999, Hamilton Corp. issued a press release announcing its 1998

financial results. That press release stated that net income for 1998 was $21.8 million.

Masferrer was quoted in this press release as claiming that 1998 was "another year of record

earnings and strong financial performance." The press release was false because as discussed

above, Hamilton Corp.'s earnings during 1998 were inflated by its failure to properly account for

the Russian loans it sold during the third quarter of that year and the related purchase of the Latin

12

American securities and perpetual notes acquired shortly thereafter.  In reality, Hamilton Corp.'s net income for 1998 was only approximately $7.5 million.

43.     Finally, on October 20, 1999, Hamilton Corp. issued a press release announcing a net loss of $736,000 for the third quarter of 1999.  That press release was materially false and misleading because it overstated Hamilton Corp's income as a result of the improper accounting of the Mexican notes and the foreign debt obligations.  In reality, Hamilton Corp. had a net loss of $2.6 million for the third quarter of 1999.

## THE FRAUDULENT SCHEME UNRAVELS

44.     In December 1999, the OCC completed an annual examination of Hamilton Bank. The OCC concluded that Hamilton Bank overpaid for the Latin American securities and perpetual notes it acquired from West Merchant and Standard in 1998 and directed it to write down the securities in its books to their fair value. The OCC also raised concerns about Hamilton Bank's sale of the Mexican trade notes to West Merchant in September 1999 and the fact that Hamilton Bank was able to sell the impaired notes for face value.  Shortly thereafter, in December 1999, Hamilton Corp. wrote down the Latin American securities and the foreign debt obligations to their fair value in its books and records and recognized a loss with respect to the Mexican trade notes.

45.     In early 2000, upon receiving information from West Merchant and Standard, the OCC concluded that Hamilton Bank's sale of the Russian assets and Mexican trade notes and its near simultaneous purchase of other investment assets from West Merchant and Standard were even swaps of impaired assets and cash.

46.     In April 2000, after conducting an extensive investigation, the OCC entered a temporary cease and desist order against Hamilton Bank for unsafe and unsound banking practices for failing to recognize losses when it sold the Russian loans.

47.     On December 26, 2002, Hamilton Corp. restated its annual and quarterly filings with the SEC to properly account for the 1998 exchange transactions in accordance with GAAP. As part of its restatement, Hamilton Corp. recorded a pre-tax loss of $22.2 million on its income statement and lowered its net income to approximately $7.5 million for 1998 from $21.8 million.

## ROLE OF MASFERRER, BERNACE AND JACOBS

48.     Masferrer, Bernace and Jacobs perpetrated a scheme to mask Hamilton Corp.'s losses from impaired investment assets and artificially inflate its financial performance. Masferrer, Bernace and Jacobs were each intimately involved in each and every "adjusted price trade," (or "ratio swap") which served as the vehicle for perpetrating the fraudulent scheme. Masferrer, Bernace and Jacobs each knew that the assets which Hamilton Bank exchanged were severely impaired and not worth their face values.  Masferrer, Bernace and Jacobs each knew that the transactions with West Merchant and Standard were simply even exchanges of cash and impaired assets.

49.     The sheer number of instances in which Masferrer, Bernace and Jacobs caused Hamilton Bank to engage in the "adjusted price trades" (also known as "ratio swaps"), the particular assets which were exchanged and the timing of the transactions (at the end of quarters in which losses would need to be taken if the assets remained on the bank's books) demonstrate that they knew, or were severely reckless in not knowing, that Hamilton Corp. should have recognized losses on the impaired assets.

50.     In addition, as set forth in paragraph 19 above, Hamilton Bank's internal policies manual explicitly prohibited "adjusted price trading" because such a practice inappropriately deferred revenue recognition and established excessive reported values for newly acquired securities.  Upon information and belief, Masferrer, Bernace and Jacobs knew Hamilton Bank's policy concerning "adjusted price trading" or established such a policy.

51.     Masferrer, Bernace and Jacobs perpetrated the fraudulent scheme to overstate Hamilton Corp.'s financial results due to tremendous pressure from Wallstreet for the company to meet or exceed earnings projections.   In part, Masferrer, Bernace and Jacobs caused Hamilton Corp. to fail to recognize losses and thereby grossly overstate its financial performance because of a stock offering planned for December 1998.

52.     Moreover, Masferrer, Bernace and Jacobs had a vested personal interest in Hamilton Corp.'s financials because their bonuses were tied directly to a percentage of the company's pre-tax income.

53.     Masferrer, Bernace and Jacobs each directly participated in the management of Hamilton Corp. and Hamilton Bank and were directly involved in their day-to-day operations at the highest levels.  By reason of their positions, Masferrer, Bernace and Jacobs had access to internal company documents, reports and other information concerning Hamilton Corp.'s financial condition.  Indeed, commencing in November of 1999, Jacobs was responsible for managing and monitoring Hamilton Bank's financial controls, including its accounting. Masferrer, Bernace and Jacobs controlled or had the power to control the contents of Hamilton Corp.'s fraudulent SEC filings and press releases.  Masferrer and Jacobs signed Hamilton Corp.'s Form 10-K for the year ended 1998 and its Forms 10-Q for the quarters ended March 31, 1999, June

30, 1999 and September 30, 1999. Bernace signed Hamilton Corp.'s Form 10-Q for quarter ended September 1998.

54.     Based on the foregoing allegations, as well as others described herein, Masferrer, Bernace and Jacobs knew, or were severely reckless in not knowing, that the financial information contained in the filings and press releases, identified in paragraphs 40-43 above, were materially false and misleading.

## FALSE AND MISLEADING STATEMENTS TO HAMILTON'S CORP.'S AUDITOR

55.     Deloitte & Touche, LLP, Hamilton Corp.'s independent auditor, conducted the quarterly reviews of Hamilton Corp.'s financial results for the quarters ended September 30, 1998, March 31, 1999, June 30, 1999 and September 30, 1999. Deloitte & Touche, LLP also conducted the annual audit of Hamilton Corp.'s financial results for the year ended 1998.

56.     In connection with these reviews, Hamilton Corp. and Hamilton Bank provided Deloitte & Touche, LLP with management representation letters signed by Jacobs and Bernace which represented, among other things, that: (1) the relevant financial statements were "fairly presented in conformity with generally accepted accounting principles;" (2) "there [was] no fraud involving management or employees who have significant roles in internal control; (3) "there [were] no transactions that [were] not properly recorded in the accounting records underlying the financial statements."

57.     Based on the fraudulent scheme described above, these statements in the management representation letters were blatantly false.

## COUNT I

### DEFENDANTS VIOLATED SECTION 10(b)
### OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

58.     The Commission repeats and realleges the allegations set forth in paragraphs 1 through 57 of this Complaint.

59.     From September 1998 through November 1999, Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities, as described herein, willfully, knowingly or recklessly:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices and courses of business, which operated, as a fraud upon the purchasers of such securities.

60.     By virtue of the conduct described herein, Defendants, directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## COUNT II

### DEFENDANTS AIDED AND ABETTED HAMILTON CORP.'S
### VIOLATIONS OF SECTION 13(a) OF THE EXCHANGE ACT AND
### RULES 12b-20, 13a-1 AND 13a-13, THEREUNDER

61.     The Commission repeats and realleges the allegations set forth in paragraphs 1 through 57 of this Complaint.

62.    The Exchange Act and rules promulgated thereunder require every issuer of a registered security to file reports with the SEC that accurately reflect the issuer's financial performance and provide other information to the public. Rule 12b-20 provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

63.    At all relevant times, Hamilton Corp. was an issuer subject to these reporting requirements.

64.    Hamilton Corp. failed to file reports with the SEC that accurately reflected its financial performance.

65.    By virtue of the conduct described herein, Defendants knowingly or recklessly provided substantial assistance to Hamilton Corp.'s violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m] and Rules 13a-1, 13a-13 and 12b-20 [17 C.F.R. § 240.13a-1, 240.13a-13 and 240.12b-20].

## COUNT III

### DEFENDANTS AIDED AND ABETTED HAMILTON CORP.'S VIOLATIONS OF SECTIONS 13(b)(2)(A) AND 13(b)(2)(B) OF THE EXCHANGE ACT

66.    The Commission repeats and realleges the allegations set forth in paragraphs 1 through 57 of this Complaint.

67.    The Exchange Act and rules promulgated thereunder require every issuer of a registered security to make and keep books, records, and/or accounts, which, in reasonable detail, accurately and fairly reflect its transactions and the dispositions of its assets, and devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that

transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

68.     At all relevant times, Hamilton Corp. was an issuer subject to these record keeping requirements.

69.     Hamilton Corp. failed to make and keep books, records, and/or accounts, which, in reasonable detail, accurately and fairly reflected its transactions and the disposition of its assets and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

70.     Defendants knowingly or recklessly provided substantial assistance to Hamilton Corp.'s violations of Sections 13(b)(2)(A) and (b)(2)(B) of the Exchange Act [15 U.S.C. § 78m].

**COUNT IV**

**BERNACE AND JACOBS VIOLATED SECTION 13(b)(2)
OF THE EXCHANGE ACT
AND RULE 13b2-2 THEREUNDER**

71.     The Commission repeats and realleges the allegations set forth in paragraphs 1 through 57 of this Complaint.

72.     As alleged above, Bernace and Jacobs directly or indirectly, made or caused to be made materially false or misleading statements or omissions to Hamilton Corp.'s independent auditors in connection with their quarterly reviews of Hamilton Corp.'s financial statements for the quarters ended September 30, 1998, March 31, 1999, June 30, 1999 and September 30, 1999 and for the year ended 1998.

73.     By virtue of the conduct described herein, Bernace and Jacobs violated Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m] and Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

## I.

### Permanent Injunctive Relief

Issue a Permanent Injunction, restraining and enjoining Defendants Masferrer, Bernace and Jacobs, their agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]; Section 13(a) of the Exchange Act [15 U.S.C. § 78m] and Rules 13a-1, 13a-13 and 12b-20 [17 C.F.R. § 240.13a-1, 240.13a-13 and 240.12b-20]; Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m]; and, solely as to Bernace and Jacobs, Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m] and Rule 13b2-2 [17 C.F.R. 240.13b2-1].

## II.

### Disgorgement and Accounting

Issue an Order requiring Masferrer, Bernace and Jacobs to disgorge all ill-gotten profits or proceeds that they received, directly or indirectly, as a result of the acts and/or courses of conduct complained of herein, including, but not limited to, bonuses and salaries received in 1998 and 1999, with prejudgment interest, and an accounting by Masferrer, Bernace and Jacobs of all proceeds received, directly or indirectly, pursuant to the scheme described in this Complaint.

## III.

### Penalties

Issue an Order directing Defendants Masferrer, Bernace and Jacobs to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## IV.

### Officer and Director Bar

Pursuant to Section 21(d)(2) of the Exchange Act, [15 U.S.C. §78u(d)(2)], enter an Order barring Defendants Masferrer, Bernace and Jacobs from acting as an officer or director of an issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], as a result of their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## V.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VI.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

September 25, 2003      By:      _____

Kerry Zinn
Senior Trial Counsel
Florida Bar No. 118559
Direct Dial:  (305) 982-6379

Chedly C. Dumornay
Deputy Assistant Regional Director
Florida Bar No. 957666
Direct Dial:  (305) 982-6377

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

**03 - 22524**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I.(a) PLAINTIFFS**

SECURITIES AND EXCHANGE COMMISSION

FILED BY
2003 SEP 25 PM

CLERK U.S. DIST. CT.
S/D OF FLA.

**DEFENDANTS**

EDUARDO MASFERRER,
JUAN CARLOS BERNACE, and
JOHN M.R. JACOBS,

**CIV - JORDAN**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT     Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)     **MAGISTRATE JUDGE**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.     **BROWN**

Dade | 03 - 22524 -Civ-Jordan/Brown

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kerry Zinn, Esq. (305) 982-6379  SEC
801 Brickell Ave., Suite 1800, Miami, FL 33131

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION     (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)     AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN     (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT     (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | B☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☒ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☒ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 535 Death Penalty | A☐ 791 Empl. Ret. Inc Security Act | A☐ 871 IRS – Third Party 26 USC 7809 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | A OR B | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION     (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5, 15 U.S.C. § 78m, 17 C.F.R. §§ 240.13a-1, 240.13a-13 and 240.12b-20, and 17 C.F.R. 240.13b2-1. Violations of the federal securities laws.

LENGTH OF TRIAL
via 7 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $
Perm. Inj., Penalties, Disgorgement

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE

DOCKET NUMBER

DATE  9/25/03

SIGNATURE OF ATTORNEY OF RECORD
Kerry L. Zinn

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____